IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Jeffrey Curtis, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 50285 |
| | ) | |
| vs. | ) | |
| | ) | |
| FCA US, LLC, et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated below, Tovar's motion for summary judgment [132] is granted. FCA's motion for summary judgment [135] is granted in part and denied in part. FCA's motion for summary judgment is denied as to its claims against Tovar (Counts IV and V). FCA's motion for summary judgment against Tri-Dim is granted as to the declaratory relief (duty to defend) sought in Count I and as to the Count II breach of the duty to defend. FCA's motion for summary judgment is otherwise denied. The parties remaining in this case are directed to contact Magistrate Judge Johnston within 30 days to arrange a settlement conference.

## STATEMENT-OPINION

Plaintiff, Jeffrey Curtis, is a citizen of Illinois. Defendant, FCA US, LLC ("FCA"), as stated in its answer [31], is a Delaware limited liability company, whose sole member is FCA North America Holdings LLC, also a Delaware limited liability company, whose sole member is Fiat Chrysler Automobiles N.V., a corporation organized under the laws of The Netherlands with its principal place of business in London, England. FCA, therefore, is a citizen of The Netherlands and England for diversity jurisdiction purposes. The amount in controversy exceeds $75,000. Third party defendant Tri-Dim Filter Corporation ("Tri-Dim") is a Delaware corporation with its principal place of business in Virginia. Third Party defendant Tovar Snow Professionals, Inc. ("Tovar") is an Illinois corporation with its principal place of business in Illinois. Subject matter jurisdiction is proper. 28 U.S.C. §§ 1332(a) and 1367(a).

Plaintiff was an employee of Tri-Dim. Tri-Dim had a contract to provide janitorial services to FCA at FCA's Chrysler Assembly Plant ("Plant") in Belvidere, Illinois. Plaintiff alleges he was at the Plant as a Tri-Dim employee on January 23, 2015 and was injured when he slipped on ice and fell while attempting to exit the Plant. At that time, FCA had a contract with Premier Group Associates, LC ("Premier") for Premier to provide snow removal services at the Plant. Premier subcontracted the snow removal work to Tovar.

FCA has pending a third-party complaint against Tri-Dim and Tovar seeking a declaratory judgment that each of them was required by contract to defend, indemnify, and insure FCA against plaintiff's claims and that each of them breached its contractual duties to do so. FCA also seeks contribution from Tri-Dim and Tovar.

FCA moves for partial summary judgment on the declaratory actions (Count I against Tri-Dim & Count IV against Tovar) and on the breach of contract claims (Count II against Tri-Dim & Count V against Tovar). FCA does not seek summary judgment on the contribution claims. Tovar moves for summary judgment against FCA on all of FCA's claims against Tovar.

**Tri-Dim**

Tri-Dim argues venue is improper because its contract with FCA provides "[a]ny suit regarding or relating to this Order may only be brought in the state or federal court in and for Oakland County, Michigan, USA, which are the exclusive venue for any such suit." [137-3, p. 32, ¶ 23(b)]. Notwithstanding this provision, FCA filed its third-party action against Tri-Dim in this court in the original action brought by plaintiff against FCA.

The proper way to seek enforcement of a forum-selection clause is by a motion to transfer to the selected forum pursuant to 28 U.S.C. § 1404(a), if the selected forum is a federal court, or via the doctrine of forum non conveniens, if the selected forum is a state or foreign forum. Atlantic Marine Construction Co., Inc. v. U.S. District Court for Western District of Texas, 571 U.S. 49 (2013). Tri-Dim did not file such a motion. A "forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3)." Id., at 59. Accordingly, the contract forum-selection clause does not render this court an improper venue for this third-party action.

The contract also contains a provision that it "will be governed by and construed in accordance with the laws of Michigan as if entirely performed therein." [137-3, p.32, ¶ 23(a)] Tri-Dim argues that, notwithstanding this provision, Illinois law applies to the contract. In cases where subject-matter jurisdiction is based on diversity of citizenship, the choice-of-law rules used by the state in which the federal district court sits – here, Illinois – are applied. NewSpin Sports, LLC v. Arrow Electronics, Inc., 910 F.3d 293, 300 (7th Cir. 2018). "Illinois courts usually enforce contractual choice-of-law provisions." Id. In Illinois, "where the parties have contracted to apply the law of a particular forum, the parties' choice of law will be respected unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of the applicable law in the absence of an effective choice of law by the parties." PCM Sales, Inc. v. Reed, No. 16-CV-02334, 2017 WL 4310666, * 4 (N.D. Ill. Sept. 28, 2017) (citation and quotation marks omitted). The state where one of the parties has its principal place of business is

an acceptable state to choose in a choice-of-law provision. Id. FCA's principal place of business is in Michigan. This meets the substantial connection requirement. Id.

Tri-Dim argues the application of Michigan law would be contrary to a fundamental policy of Illinois and that Illinois has a materially greater interest in the determination of this litigation. As to being contrary to a fundamental policy of the State of Illinois, Tri-Dim argues that "Illinois disfavors duties to defend in non-insurance contracts" and, "[c]onsistent with this policy, permits an alleged indemnitor in a non-insurance contract to investigate the truth of allegations and factual issues in a complaint to determine the scope of the duty to defend." Tri-Dim argues "[c]onversely, Michigan does not permit an alleged indemnitor to investigate the truth of the allegations that are asserted. Instead, Michigan courts look solely to the allegations of the underlying complaint." Tri-Dim maintains the Illinois policy of allowing an investigation, by a non-insurance company indemnitor, of the truth of the allegations in a complaint before determining the scope of the duty to defend is a fundamental policy of Illinois.

"The public policy of a State must be sought in its constitution, legislative enactments and judicial decisions." Roanoke Agency, Inc. v. Edgar, 461 N.E.2d 1365, 1371 (Ill. 1984). Tri-Dim does not argue the Illinois Constitution or any Illinois legislative enactment establishes a public policy requiring that an alleged indemnitor in a non-insurance contract be permitted to investigate the truth of the allegations in a complaint to determine the scope of the duty to defend. Tri-Dim's argument cites Medline Industries, Inc. v. Ram Medical, Inc., 892 F. Supp. 2d 957 (N.D. Ill. 2012) and Ervin v. Sears, Roebuck & Co., 469 N.E.2d 243 (Ill. App. 1987) to support its argument on this point. Medline's treatment of this issue is limited to a discussion of Ervin in the context of determining whether a claim for the breach of a duty to defend was ripe for adjudication. Medline, 892 F. Supp.2d at 965-66. Ervin, then, is the authority on which Tri-Dim bases its claim that it is a fundamental policy of Illinois that an alleged indemnitor in a non-insurance contract is allowed to investigate the truth of the allegations in the complaint to determine the scope of its duty to defend. Ervin held that where a contract provides a duty on the part of a seller (Flagg) of goods to defend and indemnify the buyer (Sears) in suits involving those goods, the seller, unlike an insurance company (which is a professional seller of protection against loss and must defend based on allegations in a complaint), is entitled to investigate the truth of a complaint's allegations to determine its duty to defend. Ervin, 469 N.E.2d at 249-50. In Ervin, there was a factual question as to whether the product at issue had actually been manufactured and sold by Flagg rather than some third party. The court held that if Flagg made the product, it breached its duty to defend Sears but if it did not make the product, it breached no duty. Id., at 250.

However, a more recent Illinois Appellate Court decision did not make any distinction between an alleged insurance company versus non-insurance company indemnitor in analyzing the duty to defend obligation. 933 Van Buren Condominium Association v. West Van Buren, LLC, 61 N.E.3d 929 (Ill. App. 2016). West Van Buren held a non-insurance contractual indemnitor's duty to defend arose solely from the allegations of the complaint and the indemnity

agreement. Id., at 945. This decision weighs against Tri-Dim's argument that the distinction made in Ervin is a policy of the State of Illinois, much less a fundamental policy.

An Illinois "court should not refuse to apply the law of a foreign state, however unlike its own, unless it is contrary to pure morals and abstract justice, or unless the enforcement would be an evil example and harmful to its people." Potomac Leasing Co. v. Chuck's Pub, Inc., 509 N.E.2d 751, 754 (Ill. App. 1987) (quotation marks and citation omitted). Whether or not an alleged non-insurance company indemnitor's duty to defend arises solely from the allegations of the complaint, as Michigan law provides (and as West Van Buren holds Illinois does as well) or if that duty to defend does not arise from the allegations of the complaint but allows the alleged indemnitor to investigate the truth of the allegations to determine its duty to defend as Ervin holds, does not change the effectiveness of the contract's choice to apply Michigan law. There is nothing "contrary to pure morals and abstract justice" nor would it "be an evil example or harmful to" the people of Illinois for a non-insurance company defendant who has contractually agreed to be bound by the laws of Michigan to be held subject to those laws because those laws make its duty to defend arise from the allegations of the complaint rather than allowing an investigation of the truth of the allegations to determine the duty to defend. "In an arms-length business transaction, the parties' freedom to contract is an important right that must be jealously guarded and left free from unnecessary interference by the courts." Id., at 755. The difference between Michigan law and (assuming for the sake of argument that Ervin states Illinois law) Illinois law is not of the kind that overcomes the parties' right to choose to apply the law of Michigan to their contract.

Further, Tri-Dim has not established that Illinois has a materially greater interest in the determination of this matter than Michigan. Absent agreement on a choice of law, "Illinois follows Restatement (Second) of Conflict of Laws § 188, which identifies a number of factors to be weighed in determining the applicable law, including: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties." PCM Sales, Inc., 2017 WL 4310666 at * 3. It is undisputed that FCA is a Delaware limited liability company with its principal place of business in Michigan, Tri-Dim is a Delaware corporation with its principal place of business in Virginia. Tri-Dim's statement of facts does not present any facts as to the place of contracting or the place of negotiation of the contract. The contract was performed at FCA's Chrysler plant in Illinois.

These facts do not suggest that Illinois has a materially greater interest in the determination of this matter than Michigan. FCA's principal place of business is Michigan. Tri-Dim is not an Illinois corporation nor is its principal place of business in Illinois. There is no other evidence cited in the statement of facts that the contract was negotiated or made in Illinois. The only factor weighing in favor of an Illinois interest in determining the matter is the fact the performance of the contract occurred in Illinois. This is not enough to override the contractual choice of Michigan law made by two business entities in an arms-length business transaction. Potomac Leasing Co., 509 N.E.2d at 755.

The contract contains the following provision:

"11. **INSURANCE AND INDEMNIFICATION**.
(a)  Insurance. Seller will obtain and continuously maintain in force during the Term (I) statutory worker's compensation insurance, (ii) employer's liability insurance, (iii) commercial general liability insurance, including contractual liability and products and completed operations liability, (iv) automobile liability insurance, including owned, hired and non-owned liability, (v) crime insurance, including employee theft, and (vi) all-risk property insurance covering Seller's property, and all Chrysler property including Tooling, raw materials and finished products, while in Seller's possession or in Seller's care, custody and control, all in amounts and coverages sufficient to cover all claims hereunder. Such policies will name Chrysler as an additional insured thereunder; be primary and not excess over or contributory with any other valid, applicable, and collectible insurance in force for or maintained by Chrysler; and provide that the insurer will give Chrysler thirty days prior written notice of cancellation or material change in coverage. Seller waives, and Seller will cause its insurer to waive, any right or subrogation or other recovery against Chrysler or its subsidiaries, including their respective employees, officers, directors, agents or representatives. Chrysler may require Seller to furnish evidence of any of the foregoing insurance but Chrysler's failure to request evidence of insurance will in no event relieve Seller of its obligation under this Clause 11. Seller will be financially responsible for any of Seller's premiums, deductibles, retentions, self-insurance, co-insurance, uninsured amounts, or any amounts in excess of policy limits. Seller may satisfy the insurance requirements under this Clause 11 through a combination of self-insurance and catastrophic excess insurance.

(b)  Indemnification. Seller will defend, indemnify, and hold Chrysler and its subsidiaries, including their respective employees, officers, directors, agents or representatives harmless against all claims, suits, actions or proceedings ("Claims") and pay (I) all liabilities, losses, damages (including without limitation judgments, amounts paid in settlement and other recoveries), (ii) fees and expenses (including without limitation fees of counsel and experts) and (iii) other costs (collectively, "Expenses") in connection with any breach or nonperformance by Seller of the Order, or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing the Order, either on Chrysler's property or in the course of their employment (including without limitation, Expenses arising out of, or in connection with, vehicle recall and customer satisfaction campaigns)."

Tri-Dim argues it has no duty to defend or indemnify FCA under this contract. It argues Curtis's second amended complaint bases its negligence claim on FCA's drainage system not on the janitorial services provided by Tri-Dim. Tri-Dim contends it was not responsible for FCA's failure to address the hazards only FCA had control over – FCA's equipment, pipes, sprinklers, roof and lighting. Tovar, not Tri-Dim, was contracted to control snow and ice at the Plant. Tri-

Dim argues "[t]o hold that Tri-Dim owes FCA a defense and indemnity concerning issues for which FCA was solely responsible would require an incredibly liberal and unsupported interpretation of the Purchase Order." Tri-Dim maintains that there are factual questions about what plaintiff was doing at the time of the occurrence that bear on whether his accident was in connection with performing the Tri-Dim contract.

However, contract language very similar to the above language in the subject contract has been held by the Michigan Court of Appeals to impose a duty on Seller to indemnify, and insure Chrysler under circumstances similar to those present in the case before the court. Daimler Chrysler Corp. v. Process Development Corp., No. 234827, 235741, 2003 WL 21715874 (Mich. Ct. App. July 24, 2003)[1]. In that case, Gladigan was an employee of PDC who was injured at a Chrysler plant in Twinsburg, Ohio when a Chrysler employee operating a forklift caused a rack to fall on Gladigan while he was walking on a pedestrian walkway. Gladigan sued Chrysler and the parties settled. Chrysler then sued PDC claiming PDC was obligated to pay for Gladigan's injuries under the terms of a contract between PDC and Chrysler. The relevant contract language was as follows (PDC was "Seller" in this contract) :

> "11. INSURANCE AND INDEMNIFICATION. (a) Insurance. Seller will provide worker's compensation, comprehensive general liability, automobile, public liability, and property damage insurance in amounts and coverages sufficient to cover all claims hereunder. Such policies will name Chrysler as an additional insured thereunder and shall contain endorsements stating that the policies are primary and not excess over or contributory with any other valid, applicable, and collectible insurance in force for Chrysler. Chrysler may require Seller to furnish evidence of the foregoing insurance but failure to comply with these insurance requirements will not relieve Seller of its liability and obligations under this

---

[1] Tri-Dim objects to FCA's citation of this case asserting it is a non-precedential opinion pursuant to Michigan Court Rule 7.215. Mich. Ct. R. 7.215(C)(1) provides: "An unpublished opinion is not precedentially binding under the rule of stare decisis. Unpublished opinions should not be cited for propositions of law for which there is published authority. If a party cites an unpublished opinion, the party shall explain the reason for citing it and how it is relevant to the issues presented." The relevance of the case is obvious. The case involves contract language which is nearly identical to the language at issue in the case before the court applied to facts which are very similar to the facts here. Though not binding precedent, unpublished Michigan Court of Appeals opinions may be considered instructive or persuasive. Paris Meadows, LLC v. City of Kentwood, 783 N.W.2d 133, 145, n.3 (Mich. Ct. App. 2010). A federal court sitting in diversity is not bound by a state intermediate appellate court's decision anyway because the federal court's duty is to apply the law of the state as it believes the highest court of the state would apply it, Liberty Surplus Ins. Corp. v. City of Vandalia, Illinois, No. 17-cv-1536, 2018 WL 27455896, * 3 (C.D. Ill. June 7, 2018). However, decisions of the intermediate appellate courts are followed unless there is a convincing reason to predict the state's highest court would disagree. Id. The court sees no reason to predict the Michigan Supreme Court would interpret and apply the subject contract language differently than the Michigan Court of Appeals did in Process Development. The court finds the interpretation and application of the contract language by the Process Development court persuasive and applicable to the nearly identical language in this case.

6

clause. Chrysler's action or inaction will not act as a waiver of any of Chrysler's rights described in this clause.
(b) Indemnification. Seller will defend, indemnify, and hold Chrysler harmless against all claims, liabilities, losses, damages, and settlement expenses in connection with any breach by Seller of these general conditions or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing this order, either on Chrysler's property or in the course of their employment."

In analyzing the contract language, the court stated:

"'When presented with a contractual dispute, a court must determine what the parties' agreement is and enforce it.' Brucker v. McKinlay Transport, Inc, 225 Mich.App 442, 449; 571 NW2d 548 (1997). 'Contractual language is to be given its plain and ordinary meaning, and technical and constrained constructions are to be avoided.' Id. 'An indemnity contract is construed in the same fashion as are contracts generally.' Zurich Ins Co v. CCR & Co (On Rehearing), 226 Mich.App 599, 603; 576 NW2d 392 (1997). Moreover, Michigan courts have discarded the additional rule of construction that indemnity contracts will not be construed to provide indemnification for the indemnitee's own negligence unless such an intent is expressly clearly and unequivocally in the contract.... Instead, broad indemnity language may be interpreted to protect the indemnitee against its own negligence if this intent can be ascertained from 'other language in the contract, surrounding circumstances, or from the purpose sought to be accomplished by the parties.' [Sherman v. DeMaria Bldg Co, 203 Mich.App 593, 596-597; 513 NW2d 187 (1994), quoting Fischback-Natkin Co v. Power Process Piping, Inc, 157 Mich.App 448, 452; 403 NW2d 569 (1987); see also Triple E Produce Corp v. Mastronardi Produce, Ltd, 209 Mich.App 165, 172 (1995).]

Here, paragraph 11(b) clearly states that PDC will 'hold Chrysler harmless against all ... settlement expenses ... for injury or death of any person ... allegedly or actually ... arising out of any act ... of Seller or its employees, agents, or subcontractors in connection with performing this order, either on Chrysler's property or in the course of their employment.' Clearly, the injury in question arose out of Gladigan's act of traversing the walkway in Chrysler's plant in connection with performing a purchase order between PDC and Chrysler. Under the above rules of statutory construction, it is plainly apparent that the indemnification clause covers the accident expenses regardless of Chrysler's negligence."

<u>Process Development</u>, 2003 WL 21715874, at * 9 (internal quotation marks omitted) (ellipses in original).

The court went on to state:

"Finally, the presence of paragraph 11(a) directly above the indemnification language at issue in the present case reinforces that Chrysler was not to be held responsible for damages arising out of the performance of the purchase order and that PDC was required to obtain insurance 'in amounts and coverages sufficient to cover all claims hereunder' and to 'name Chrysler as an additional insured.' Thus, the surrounding circumstances, see Sherman, supra at 597, demonstrate that Chrysler was not to be required to pay for injuries occurring in connection with the purchase order."

Id., at *10.

Here, Curtis was a Tri-Dim employee. Tri-Dim is the "Seller" under the contract. Curtis alleges he was injured when he slipped on ice and fell while attempting to exit the Plant at Door U37. He alleges FCA's negligence caused his injuries. Like Gladigan in Process Development, Curtis was working at FCA's plant because of his employment by the contract "Seller" to perform services at the Plant and claims he was injured by FCA's negligence while on the premises. Because of this, Curtis's claims are legally indistinguishable from Gladigan's claims for purposes of applying paragraphs 11(a) and (b) of the contract. Under those contract terms, Tri-Dim was and is obligated to defend FCA against Curtis's suit, was required to maintain insurance covering FCA against Curtis's claims, and will be required to "pay (I) all liabilities, losses, damages (including without limitation judgments, amounts paid in settlement and other recoveries), (ii) fees and expenses (including without limitation fees of counsel and experts) and (iii) other costs" incurred by FCA arising from Curtis's injuries. FCA is entitled to summary judgment on Count I. As to Count II, Tri-Dim has breached its contractual duty to defend. However, since FCA has not yet been required to pay Curtis any sums arising from his injuries, Tri-Dim's duty to indemnify has not yet been triggered nor has any loss been established from a failure to provide insurance. Therefore, FCA's motion for summary judgment as to Count II is granted as to the breach of the duty to defend but is otherwise denied.

**Tovar**

FCA argues Tovar also is obligated to defend, indemnify, and insure FCA. FCA argues it is an intended third-party beneficiary of Tovar's subcontract with Premier and is entitled to the benefits conferred by the subcontract including the scope of work and the general terms and conditions incorporated in the subcontract. The general terms and conditions included the Michigan choice of law provision and the same paragraph 11 set forth above in the Tri-Dim contract. Tovar argues its subcontract with Premier did not include the general terms and conditions so Illinois law applies and Tovar is not obliged to defend FCA and is not required to indemnify or insure FCA against FCA's own negligence.

8

Tovar's subcontract with Premier [134-11] provides in relevant part:

"All work must be in compliance with Chrysler Scope of Work (SOW) to be provided to [Tovar]."

"[Tovar] required to provide proof of insurance and indemnity to benefit of [Premier] and Chrysler to [Premier] satisfaction."

"[Tovar] agrees not to disclose any terms of this Purchase Order or its relationship with [Premier] with Chrysler or other third parties. [Tovar] agrees that it will not solicit or accept work with Chrysler Plant for a period of twelve months following termination of this Agreement. [Tovar] agrees to indemnify [Premier]/Chrysler."

Tovar's subcontract with Premier contains a section entitled "Chrysler Snow Scope of Work (Draft)." That section begins "[b]elow are any and all site specific snow/ice removal needs specific to the above listed facility for the 2014/2015 snow/ice removal season. The below mentioned specifics encompass everything that is to be considered for performing these ice/snow services." The balance of this section details requirements to be met in performing the snow/ice removal work. A list of bullet points includes: "Insurance coverage meets Chrysler requirements." The bullet points also include: "Damage to the site is to be reported to plant representative immediately" and "Operators/providers are responsible for all damages to the site and must be arranged to correct within 24 hours."

The subcontract continues by providing specifics concerning when and how snow removal and de-icing activities are to be performed. It provides: "While notification is requested at Chrysler sites prior to snow removal services, response is not required to continue with services necessary to remove snow and/or deice. [Tovar] should document their call to Chrysler and if no response from Chrysler then [Tovar] should proceed to service the property at their discretion to achieve SOW standards." The subcontract contains a subsection titled "Rate Sheet Belvidere." The subsection lists rates for specific services under the heading: "Snow Removal (lots, walks, doors, docks, etc. per Scope of Work (SOW) per EVENT per ACRE."

FCA argues that the term "Chrysler Scope of Work (SOW)" used in the subcontract refers to the "Statement of Work" [137-4] which is part of Premier's contract with FCA. This Statement of Work includes a provision which states: "Providers are subject to all Chrysler Purchasing Terms and Conditions." FCA contends the Tovar/Premier subcontract's provision that "[a]ll work must be in compliance with Chrysler Scope of Work (SOW) to be provided to [Tovar]" means Tovar is agreeing to be bound by the Statement of Work [137-4] which, by its terms, makes "Providers" subject to "all Chrysler Purchasing Terms and Conditions." The Purchasing Terms and Conditions include the Michigan choice of law provision and the duty to defend, indemnify, and insure.

9

Tovar argues it agreed in the subcontract to perform in accordance with Chrysler's Scope of Work not the Statement of Work and that the Scope of Work is set forth in the subcontract itself. It maintains the Scope of Work set forth in the subcontract does not obligate it to defend FCA nor to indemnify or insure FCA for FCA's own negligence and does not contain a Michigan choice-of-law provision.

FCA argues that because the subcontract says that the "Chrysler Scope of Work (SOW)" is "to be provided to [Tovar]" that it must be something different than the portion of the subcontract designated "Chrysler Snow Scope of Work (Draft)" because the "Chrysler Snow Scope of Work (Draft)" is already in the subcontract and, therefore, cannot be the "Chrysler Scope of Work (SOW)" that is "to be provided." FCA also argues that Tovar's argument that the "Chrysler Snow Scope of Work (Draft)" portion of the subcontract is the same as the "Chrysler Scope of Work (SOW)" is weakened by the fact it is labeled "Draft". FCA further argues that Tovar has not offered any evidence to contradict the deposition testimony of FCA employee Sara Potter that the "Statement of Work" (which incorporates the Chrysler Purchasing Terms and Conditions) and the "Scope of Work" are "the same thing."

"Traditional contract interpretation principles in Illinois require that: an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill. 1999) (quotation marks and citation omitted).

The subcontract makes no reference to the Chrysler Purchasing Terms and Conditions. It makes no reference to the Statement of Work. It states that all work must be in compliance with the Chrysler Scope of Work (SOW) and contains within it a section entitled "Chrysler Snow Scope of Work (Draft)." This section contains the statement that "[t]he below mentioned specifics encompass everything that is to be considered for performing these ice/snow services." Nothing in the subcontract's language suggests it incorporates the Statement of Work nor the Purchasing Terms and Conditions. The "to be provided" language cannot reasonably be considered to incorporate the Statement of Work into the subcontract nor does the inclusion of the word "Draft" in the title to the Scope of Work section of the subcontract effect such an incorporation. Premier and Tovar executed the subcontract as it is written. There is no indication in the document that they intended the Scope of Work section in the executed subcontract not to be binding on them because "Draft" appears in the section's title. There is no basis to conclude the Scope of Work the first sentence of the subcontract says is "to be provided" was anything other than the Scope of Work actually provided later in the document. Nothing in the document establishes that Tovar knew of, much less agreed to be bound by, the Statement of Work and its incorporated Chrysler Purchasing Terms and Conditions. FCA employee Sara Potter's deposition testimony that the "Statement of Work" and the "Scope of Work" were "the same thing" has no bearing on the use of the term "Scope of Work" in the subcontract as nothing in the record shows Tovar agreed to be bound by the Statement of Work. FCA was not a party to the subcontract. Tovar is not subject to FCA's Purchasing Terms and Conditions and, therefore,

10

Tovar is not subject to the Michigan choice-of- law provision nor to the duty to defend, insure, and indemnify contained therein.

Looking to the terms of the subcontract as written, it imposes no duty on Tovar to defend FCA under any circumstances. The subcontract makes no mention of any duty to defend.

As to indemnity and insurance the subcontract states: "[Tovar] required to provide proof of insurance and indemnity to benefit of [Premier] and Chrysler to [Premier] satisfaction." In a bullet point labeled "Non Disclosure and Non Compete", after discussing Tovar's non-disclosure and non-compete obligations, the bullet point concludes "[Tovar] agrees to indemnify [Premier]/Chrysler." Later, in the Scope of Work section, the subcontract lists in a bullet point: "Insurance coverage meets Chrysler requirements."

FCA argues that even under Illinois law, this language in the subcontract requires Tovar to indemnify and insure FCA for FCA's own negligence. FCA contends the subcontract does not contain any "limiting language" that excludes indemnifying FCA from FCA's own negligence. FCA asserts that "[w]here a contract contains no limiting language to suggest that the indemnity provision is not intended to cover claims resulting from the indemnitee's own negligence, it will be construed as an agreement to indemnify the indemnitee for its own negligence pursuant to the rest of the contract terms."

FCA cites Buenz v. Frontline Transportation Co., 882 N.E.2d 525 (Ill. 2008) in support of its argument. In Buenz, the Illinois Supreme Court held that contract language that said Frontline agreed to indemnify COSCO for "any and all claims * * * arising out of * * * the possession, use operation or returning of the equipment during all periods when the equipment shall be in the possession of COSCO" was "very broad and, considering its common unambiguous meaning, encompasses even claims which arise out of COSCO's negligence." Buenz, 882 N.E.2d at 534 (ellipses in original). "This contract contains no limiting language to suggest that the indemnity provided is not intended to cover claims resulting from COSCO's own negligence. Accordingly, we find that the express language of the interchange agreement between Frontline and COSCO clearly and explicitly provides indemnification for COSCO's own negligence pursuant to the rest of the contract terms." Id.

In reaching its conclusion, the Buenz court noted its prior holding in Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp., 70 N.E.2d 604 (Ill. 1946) that a contract should not be construed to impose a duty on a contractor to indemnify a property owner against injuries entirely outside the contractor's control "in the absence of clear language in the contract" that included injuries arising from the negligence of the property owner's own employees within the scope of the indemnity provision. Buenz, 882 N.E.2d at 529. Buenz held that the language in the contract before it clearly and explicitly provided for indemnifying COSCO for its own negligence and, thus, met the standard set forth in Westinghouse to impose the obligation on the indemnitor to indemnify the indemnitee for the indemnitee's own negligence.

11

In contrast to the clear and explicit language in Buenz, the language in the Tovar/Premier subcontract says only "[Tovar] required to provide proof of insurance and indemnity to benefit of [Premier] and Chrysler to [Premier] satisfaction" and, in another place, "[Tovar] agrees to indemnify [Premier]/Chrysler." Nowhere does the subcontract state what Tovar is agreeing to indemnify against. FCA argues that the absence of any "limiting language" saying Tovar is only indemnifying for Tovar's negligence, means Buenz requires the subcontract to be construed to mean Tovar is agreeing to indemnify FCA for FCA's own negligence.

Buenz, dealt with contract language calling for indemnifying against "any and all claims, demands, actions, suits, proceedings, costs, expenses, damages, and liability, including without limitation attorney's fees, arising out of, in connection with, or resulting from" possession of certain equipment. This clear and explicit language was not limited by any language confining the obligation to indemnify to the actions of Frontline only. Buenz discusses several cases, all of which include some version of "any and all claims" language. Those which also included language limiting the indemnity to the indemnitor's actions did not indemnify the indemnitee for the indemnitee's negligence. Those without this limiting language did indemnify the indemnitee for the indemnitee's negligence.[2] "Limiting language" only came into play where the starting point was some version of indemnifying against "any and all claims."

The language used in the Premier/Tovar subcontract does not say Tovar is indemnifying against any and all claims. It says nothing at all about what it is supposed to be indemnifying against. The language is not sufficient to impose a duty on Tovar to indemnify FCA against FCA's own negligence because the language does not clearly impose that obligation.

FCA argues the subcontract required Tovar to provide insurance for FCA and that Tovar has failed to do so. The only language in the subcontract that mentions insurance states "[Tovar] required to provide proof of insurance and indemnity to benefit [Premier] and Chrysler to [Premier] satisfaction" and "Insurance coverage meets Chrysler requirements." The subcontract does not identify what those insurance requirements were. FCA points to no evidence that Tovar did not provide proof of insurance to Premier that was to Premier's satisfaction and Premier's satisfaction was the only standard established for proof of insurance.

On summary judgment, if the "movant does *not* bear the burden of proof at trial, he can prevail by showing an absence of evidence to support *any* essential element of the nonmovant's case. But if the summary judgment movant *does* bear the burden of proof at trial, he can prevail only by proving *each* element of his case with evidence sufficiently compelling that no reasonable" fact-finder could find for the nonmovant. McKinney v. American River Transp. Co., 954 F. Supp.2d 799, 803 (S.D. Ill. 2013) (emphasis in original). Where "the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence - using any of the materials specified in Rule 56© - that would entitle it to a directed verdict if not

---

[2] Or, the Illinois Supreme Court found, were wrongly decided.

12

controverted at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2557 (1986) (emphasis in original).

FCA, as the third-party plaintiff, bears the burden of proof on its claims and, thus, can only prevail on summary judgment by presenting evidence "that would entitle it to a directed verdict if not controverted at trial." Id. FCA has not met its summary judgment burden as to its claims against Tovar. FCA has not presented evidence establishing Tovar had a duty to defend FCA, or that Tovar had a duty to indemnify FCA for FCA's own negligence. The subcontract did not establish what insurance requirements Tovar was supposed to meet and, therefore, FCA did not prove Tovar failed to meet those requirements. Accordingly, FCA's motion for summary judgment against Tovar on Counts IV and V of FCA's third-party complaint is denied.

Tovar also moves for summary judgment on all FCA's claims against it. To survive summary judgment, FCA, the nonmoving party, "must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." Diedrich v. Ocwen Loan Servicing, LLC, 839 F.3d 583, 591 (7th Cir. 2016).

As discussed above, the subcontract makes no mention of any duty on Tovar to defend FCA under any circumstances. Tovar is entitled to summary judgment on the duty to defend claims in Counts IV and V.

FCA does not cite to any additional evidence, beyond what it presented with its motion for partial summary judgment, to support its claim Tovar was obligated by the subcontract to indemnify and insure FCA. As determined above, the language of the subcontract does not establish what Tovar was supposed to be indemnifying and insuring against. FCA has the burden of presenting evidence that it would be entitled to judgment, but the contract language is vague, so the language of the subcontract itself does not support a judgment in FCA's favor. FCA does not present any extrinsic evidence related to the making of the Premier/Tovar subcontract to clarify the vague subcontract language. In the absence of clear subcontract language and any extrinsic evidence to provide clarity, the intended meaning of the subcontract's language as it relates to indemnity and insurance can only be speculated about. Speculation is not sufficient to survive summary judgment. Tovar is entitled to summary judgment on the remaining Count IV and Count V claims.

As to the Count VI contribution claim, Illinois has a Joint Tortfeasors Contribution Act. 740 ILCS 100/1 et seq. ("Act"). The Act provides: "[w]here 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them." 740 ILCS 100/2(a). "The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is liable to make contribution beyond his own pro rata share of the common liability." 740 ILCS 100/2(b).

Tovar argues FCA has not presented evidence to establish that any act or omission of Tovar caused plaintiff's injury and, therefore, FCA has not met its burden of showing Tovar is a joint tortfeasor subject to a contribution claim. Tovar contends FCA has failed to offer evidence that the ice on which plaintiff fell was the result of an unnatural accumulation caused by Tovar. Tovar maintains the ice resulted from a defect in FCA's building. Tovar argues that FCA's position that the source of the ice is unknown dooms FCA's claim because to withstand summary judgment FCA must present evidence that the ice patch was the result of Tovar's negligence. Admitting that the source of the ice is unknown, therefore, means FCA has failed to prove an element of its claim. Thus, Tovar asserts it is entitled to summary judgment.

FCA maintains the evidence shows Tovar had a contractual duty to keep the area where plaintiff fell clear of ice. FCA argues Tovar had responsibilities for maintaining and salting the exterior doorways and walkways of the plant. FCA's facilities supervisor, Bob Doser, expected that Tovar would inspect the area where plaintiff fell on a routine basis and specifically told Tovar to pay attention to that area. Tovar serviced the Plant on January 20, 21, and 22, 2015. FCA contends it was Doser's expectation that when Tovar would service the site, Tovar would return in the morning to salt due to the risk of black ice. Tovar did not return to the plant on the morning of January 23, 2015 but returned the evening of that day. Plaintiff alleges he slipped and fell at approximately 5:40 a.m. on January 23, 2015. In its response to Tovar's statement of facts, FCA points to the deposition testimony of its employee Sara Potter, in which she cites the language of the subcontract that states "[Tovar] will guarantee snow removal and de-icing services" and the language that states "to insure clear and safe operations," as evidence Tovar had a duty to keep the area where plaintiff fell free from ice at all times regardless of whether there had been any weather event (snow, freezing rain, etc.) that could lead to ice forming in the area and whether or not FCA had notified Tovar that the area needed to be de-iced and regardless the source of the ice.

Doser, FCA's facilities supervisor, testified in his deposition that there was a water leakage problem from a cooling tower on the building. When it leaked, it would leak down the overhead door U-37. The ground between U-37 and the powerhouse slopes downward away from the building toward a storm drain. Doser testified that when it was cold out and water was leaking down form the cooling tower and running down to the storm drain that the water could turn to ice.

Jimmie Gilmore, plaintiff's supervisor for Tri-Dim, testified in his deposition that after plaintiff fell, Gilmore inspected the area where plaintiff fell. He saw ice "coming down the side of the building leaking down" to the patch of ice.

Plaintiff testified in his deposition that about 20 feet to the right of where he slipped he saw mounds of plowed snow. He did not see any evidence of meltwater originating from the mounds of plowed snow and terminating in the area where he slipped and fell.

14

Tovar is correct that the evidence in the summary judgment record shows the source of the patch of ice was a leak from the building. Doser testified there was a leakage problem from a cooling tower on the building and that when it leaked the water ran off the building and flowed down to a storm drain and could freeze when it was cold. Gilmore testified based on his observation shortly after plaintiff fell that there was ice coming down the side of the building and "leaking down" to the patch of ice. FCA has not presented evidence to establish a different source. While the evidence shows the presence of snow mounds in the area, plaintiff testified he saw no evidence of meltwater runoff from a snow mound to the ice patch where he fell. Without contrary evidence, it would require speculation to assume the patch of ice was caused by meltwater in the face of plaintiff's testimony that he saw no evidence of it at the time he fell.

This leaves FCA's claim Tovar had, and breached, a duty to keep the area free from ice (regardless of its source) at the time of plaintiff's fall because Tovar had guaranteed "snow and de-icing services" "to insure clear and safe operations." FCA argues that under Illinois law "where a party has contracted to remove snow and ice but fails to do so in a timely manner, summary judgment in favor of that party is inappropriate," citing Eichler v. Plitt Theatres, Inc., 521 N.E.2d 1196 (Ill. App. 1988).

The subcontract provides:

"[Tovar] will guarantee SNOW REMOVAL AND DE-ICING services from November 1 to April 15 of the next calendar year; this period as an approximation may be increased or decreased due to weather conditions and is at the discretion of each facility.

It is expected that [Tovar] will take action (notify Plant of its Intent to service and begin de-icing or other preventive services as necessary) within an hour from weather service notification of any storm approaching. Services will be performed before and during all shifts to ensure property is clear and safe for employees arriving and departing. Each facility shall be maintained throughout the day to ensure property is clear and safe for operations."

The subcontract also provides:

"Site Supervisors should maintain contact with Plant Facility Representatives during a Snow Event as directed by Plant Facilities Representative. [Tovar] must monitor snow and ice conditions and be reachable 24 hours a day, 7 days a week. Maximum reaction time is ½ hour after contact to effectively start clearing the snow and ice."

An "Event" is defined as:

"An event is a single snow system. If the snow comes down with all day accumulations requiring several plows it is still only one event. Accordingly the billing should reflect snow removal for the Total Accumulation (inches) x the Acreage Plowed regardless how many times it had to be plowed. If a snow cessation occurs for 4 hours, this would constitute a second event. [Tovar] should document time snow stops and starts again in order to justify multiple events."

The subcontract is clear that Tovar's obligations under it are to respond to an "Event" or to a call from FCA. The language referenced by Potter "to ensure property is clear and safe for operations" is contained in a paragraph detailing Tovar's responsibility when weather service notification of an approaching storm has been received. The subcontract calls for Tovar to begin de-icing within an hour from receiving such notification and continues that services will be performed during all shifts and maintained throughout that day to ensure the property is clear and safe for operations. There is no basis for reading the language "throughout the day" in this paragraph to mean "throughout every day." The context requires reading the language to mean the day of the Event.

The summary judgment record shows no "Event" occurred on the day of plaintiff's fall. The weather data [134-23] shows no rain, snow or ice fell in the area on January 23, 2015, the date of plaintiff's fall. The data for the prior day (January 22, 2015) [134-20] shows no rain or ice on that date and that a trace amount of snow fell. The "Remarks" section of the weather data states: "Light snow from Wednesday [1/21/2019] ended 4:14am." Thus, the light snow ended more than 24 hours before plaintiff fell on January 23, 2015 at approximately 5:40 a.m.

The record does not show any call by FCA to Tovar to provide any services on January 23, 2015 prior to plaintiff's fall. While Doser testified in his deposition that in was normal for Tovar to return the morning after an Event to salt due to the possibility of black ice, nothing indicates Tovar had a duty to do so. Tovar maintains it finished servicing the plant on January 22, 2015 at 6:00 a.m. FCA disputes this citing a Tovar dispatch record [146-3] which shows Tovar employee Thomas Huber worked at the plant from 11:00 a.m. to 1:14 p.m. on January 22, 2015. This evidence shows Huber was the last Tovar employee working at the plant prior to plaintiff's fall and Huber was last there more than 16 hours before plaintiff's fall. The same document shows no Tovar employees worked at the plant after plaintiff's fall until Thomas Huber at 9:48 p.m. on January 23, 2015 approximately 16 hours after plaintiff's fall.

FCA has failed to meet its burden to show Tovar breached a duty to it, or to plaintiff, to clear the ice plaintiff slipped on. FCA has not presented evidence to show any action of Tovar caused the ice patch. FCA has not presented evidence to show Tovar had a duty to discover and remove the ice patch between the time Tovar last serviced the plant on January 22, 2015 and the time plaintiff slipped on it more than 16 hours after that last service. Tovar is entitled to summary judgment on FCA's Count VI contribution claim because FCA has not established Tovar is a joint tortfeasor.

For the forgoing reasons, Tovar's motion for summary judgment [132] is granted. FCA's motion for summary judgment [135] is granted in part and denied in part. FCA's motion for summary judgment is denied as to its claims against Tovar (Counts IV and V). FCA's motion for summary judgment against Tri-Dim is granted as to the declaratory relief (duty to defend) sought in Count I and as to the Count II breach of the duty to defend. FCA's motion for summary judgment is otherwise denied. The parties remaining in this case are directed to contact Magistrate Judge Johnston within 30 days to arrange a settlement conference.

Date: 4/12/2019       ENTER:

*Philip G. Reinhard*
United States District Court Judge

Electronic Notices. (LC)